UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:18-CV-20813-MARTINEZ-OTAZO-REYES

DANIEL GOLDBERG,

    Plaintiff,

vs.

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

    Defendant.
_____/

## DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S PROFFERED EXPERT WITNESS FROM TRIAL

Defendant, Florida International University Board of Trustees ("FIU"), by and through its undersigned counsel and pursuant to Fed. R. Evid. 702, hereby moves to exclude Plaintiff's proffered expert, Marc Egort, CPA, from testifying at trial. Mr. Egort's expert opinion should be excluded because it is unreliable and based upon insufficient facts and data. Further, Mr. Egort's failure to consider the Plaintiff's mitigation of damages similarly renders his opinion unreliable and incorrect under the law. Finally, in light of the limited scope of his testimony and the admittedly simple work performed by him, Mr. Egort's testimony does not assist the trier of fact and does not concern matters beyond the knowledge of an average juror.

## INTRODUCTION

Plaintiff, Daniel Goldberg ("Goldberg"), formerly was a student in FIU's medical school, matriculating in the Fall of 2013. After a series of performance related issues that included failing numerous courses, FIU dismissed Goldberg from the medical school in the Spring of 2017. Goldberg filed the present action on March 2, 2018, in which he alleges two claims: (1) Violation

of the Rehabilitation Act (the "Rehab Act") and (2) Violation of Americans with Disabilities Act (the "ADA"). (D.E. 1.) Goldberg has since retained Mr. Egort as an expert witness to opine on the amount of Goldberg's alleged damages. A true and correct copy of Mr. Egort's expert disclosure is attached hereto as Exhibit "A." Per his expert witness disclosure, Mr. Egort's expected testimony is expressly limited to his "present value computation [of Goldberg's alleged damages] and the amounts generated from such computations." *See* Pl.'s Expert Wit. Disclosure, Ex. A, p. 1. Specifically, Mr. Egort is expected to testify that Goldberg's damages are - - at a minimum - - $1,271,835.85, or the present value of Goldberg's lost earnings as a general physician for a period of 29 years. *See Id*. Further, Mr. Egort intends to testify that Goldberg's alleged damages top out at $1,604,720.84, or the present value of Goldberg's lost earnings as an emergency room physician for the same period. *Id*.

      Mr. Egort's disclosure notes that Plaintiff's counsel provided him with all of the data used to derive the amount of Goldberg's alleged damages. The disclosure then identifies the web-based sources of the data procured by Plaintiff's counsel and given to Mr. Egort. It provides that Mr. Egort used average resident and physician compensation figures from two PowerPoints on "Medscape.com." *See Id*. at 2. True and correct copies of each PowerPoint slide are attached hereto as Exhibits "B" through "E." Each PowerPoint slide lacks any indicia of credibility concerning the validity, basis, or origin of the figures relied upon. Finally, during Mr. Egort's deposition, it came to light that the disclosure's citations to the PowerPoint slides were copied from an email sent to Mr. Egort from Plaintiff's counsel, instructing him to use those figures in the specified slides. (Egort Depo. 35:12—37:2; 48:11—49:8; Ex. 5, pgs. 1—2.) True and correct copies of the excerpts from Mr. Egort's deposition testimony referred herein are attached hereto as Exhibit "F."

The expert disclosure also identifies three other sources Mr. Egort allegedly consulted in performing his calculations: a report from the Health Value Group ("HVG"); an excerpt from a Merritt Hawkings White Paper Series, and; a Doximity Report. Similar to the Medscape.com PowerPoints, each of these reports were obtained by Plaintiff's counsel. Mr. Egort testified that Plaintiff's counsel highlighted the material he considered relevant before instructing Mr. Egort to utilize same. Egort Depo. Ex. 5, pgs. 5, 12, and 34; Pl.'s Expert Wit. Disclosure pgs. 11, 18, and 40. Each of the reports provided to Mr. Egort by Plaintiff's counsel purports to show average physician compensation figures based on self-reported responses to nationwide surveys. *See* Pl.'s Expert Wit. Disclosure, Ex. A, pgs 10, 13, and 25. As would be expected given the speculative nature of self-reported compensation figures, the sources themselves caution against their use in isolation. Specifically, the HVG Report provides the following:

> **Responsible Use of the Data**
> . . . Relying on data from a single salary survey can result in significantly different or invalid conclusions regarding physician fair market value (FMV) compensation . . . [A]pplying a simple average is a sure way to elevate risk. Instead, when applying the data from the various surveys, it is sensible to consider various factors, such as: [1]Geography . . . [6] Use multiple data points . . . [9] Utilize multiple surveys; [10] Don't assume the median is a safe or conservative figure . . . .

Pl.'s Expert Wit. Disclosure pgs. 11—12. The HVG Report also incorporates the relevant findings of the Merritt Hawkins White Paper Series into its Physician Compensation table. *Compare Id*. at 11, column 7 with *Id*. at 18. Aside from this overlap, there is no indication that Mr. Egort used or incorporated any information from the Merrit Hawkins White Paper Series. Finally, the disclosure states that Mr. Egort was provided but apparently did not use or consider the Doximity report regarding average physician compensation.

FIU's counsel deposed Mr. Egort on November 15, 2018. During his deposition, Mr. Egort testified he did nothing to evaluate the information provided to him by Plaintiff's counsel:

> Q. On page 2 in paragraph II [of the Expert Witness Disclosure], it states that you relied upon average physician, emergency [physician] and residency compensation amounts given to you by plaintiff's counsel. Do you see that?
>
> A. I do.
>
> Q. Is that correct, that's what you relied on?
>
> A. That is correct.
>
> \* \* \*
>
> Q. Did you do anything to evaluate the propriety of the numbers that you were provided by plaintiff's counsel?
>
> A. No.
>
> Q. Did you conduct any independent research to verify the accuracy of the numbers that you were provided?
>
> A. No.
>
> Q. Did you review any U.S. Department of Labor salary information?
>
> A. No.
>
> Q. Did you make any determination about what geographic location to pull the average salary information from?
>
> A. No.
>
> Q. Do you know who made that determination?
>
> A. No.
>
> \* \* \*
>
> Q. How did you determine [that] 29 years was the proper work life expectancy to use in your calculation?
>
> A. I was given those years by [Plaintiff's counsel].
>
> Q. Do you know what he based that on?

4

>A. I do not.
>
>Q. Did you consult a social security actuarial life table in making those calculations?
>
>A. No.
>
>Q. Do you know if [Plaintiff's counsel] did that?
>
>A. I have no knowledge.
>
>Q. Do you know how old Mr. Goldberg is?
>
>A. I don't.

(Egort Depo. 35:12—19; 37:3—19; 38:8—39:1.) Additionally, Mr. Egort testified he never accounted for inflation, annual salary adjustments, or merit pay increases over the 29 year damages period. (*Id*. at 41:4—21.)

Mr. Egort also acknowledged that he never challenged the fundamental assumptions that underlie his analysis. Specifically, Mr. Egort never considered whether Goldberg could have graduated from FIU's medical school - - or any other medical school - - with the class of 2017 (*Id*. at 43:24—44:10); whether Goldberg would be able to gain acceptance to a residency program in any field, let alone emergency medicine (*Id*. at 44:11—45:14); whether Goldberg would have been able to pass the medical boards and obtain a license to practice (*Id*. at 45:15—20); or whether Goldberg even desired to practice medicine upon completing a residency program. (*Id*. at 45:21—25. In his deposition, Goldberg recounted his applications for financial analyst positions where simply having an M.D. degree makes a night and day difference and stating that not having an M.D., he would not even have a chance at getting some of these jobs. Goldberg Depo. 207:17—208:4. Excerpts of Goldberg's deposition testimony referred herein are attached hereto as Exhibit "G." Mr. Egort eventually admitted "I know nothing about Mr. Goldberg." (Egort Depo. at 44:5.)

5

Mr. Egort's lack of knowledge regarding the Plaintiff and this case was apparent when questioned about Goldberg's attempts to mitigate damages. In his deposition, Goldberg testified he has worked several jobs since his removal from FIU's medical school. Since September of 2018, Goldberg has worked as an emergency medical technician (EMT) in New York, earning $17 per hour. (Goldberg Depo. 205:23—207:2.) Plaintiff also performed contract work for a ride-share company such as Uber or Lyft. (*Id*. at 208:5—15.) Additionally, Plaintiff is a licensed EMT in New York and Florida. (*Id*. at 205:2—22.) Despite Goldberg's actual earnings and his ability to work as an EMT in two states, Mr. Egort did not account for Plaintiff's actual and potential mitigation of damages:

> Q. You didn't consider Mr. Goldberg's duty to mitigate damages in your present value calculation, correct?
>
> A. I did not.
>
> Q. Why not?
>
> A. It was never a discussion.
>
> Q. Do you know whether Mr. Goldberg has worked since he was dismissed from FIU's medical school?
>
> A. I do not.
>
> Q. Do you know whether Mr. Goldberg plans to work for the next 29 years?
>
> A. I do not.
>
> Q. Do you know what type of work Mr. Goldberg is capable of doing should he choose to work for the next 29 years?
>
> A. I do not.
>
> Q. You did not consider Mr. Goldberg's actual or potential future employment in rendering your opinions in this case, correct?
>
> A. That is correct.

> Q. Do you know if Mr. Goldberg attempted to gain acceptance to any other medical school since he was dismissed from FIU?
>
> A. I am not aware.
>
> Q. You did not consider whether Mr. Goldberg attempted to gain admission to another medical school in rendering your opinions in this case, correct?
>
> A. Correct.

(Egort Depo. 46:9—47:11.)

Finally, when questioned about the methodology used to derive the Plaintiff's alleged damages, Mr. Egort explained the simplicity of his work:

> Q. I don't understand. Can you explain?
>
> A. It's - - in a simple present value computation, you're just - - all you're doing is you're just taking what you think the future value of an earning stream is and bring it back to today's dollars.
>
> $$* \quad * \quad *$$
>
> Q. So, in essence, your calculation is based on the numbers that you were given by Plaintiff's counsel and a simple formula to calculate present value; is that correct?
>
> A. That's correct.
>
> Q. What formula did you use?
>
> A. I used future value[1] divided by one, plus [discount] rate [6%][2], multiplied by the number of periods.
>
> Q. Did you use a computer program to make that calculation?
>
> A. Oh, yes I did.

---

[1] Future value is equal to the average annual salary times 29, the assumed number of years worked. Thus, the future value amount for an "Average Physician" is $6,891,300.00, while the future value amount for an "Emergency Physician" is $8,695,000.00. *See* Pl.'s Expert Wit. Disclosure, Ex. A.

[2] Mr. Egort testified he selected a 6% discount rate simply because "it was very a conservative rate to use." (Egort Depo. 39:24—40:1.)

> Q. What program?
>
> A. I used Excel.
>
> Q. So anyone with access to a computer could plug a salary number, 29 years at 6 percent and make a present value calculation, correct?
>
>> [Plaintiff's Counsel]: Object to form.
>>
>> Egort: May I answer?
>>
>> [Plaintiff's Counsel]: Please.
>
> A. Any using my HP 12C [calculator] can do it.
>
> Q. Well, you mentioned Excel. Excel's got a built-in present value calculation - -
>
> A. It does.
>
> Q. - - formula. And are you aware that present value calculators are available on the Internet?
>
> A. They're available probably on my phone.

(Egort Depo. 41:25—42:4; 42:4—43:23.)

In sum, although Mr. Egort is expected to opine as to the amount of Goldberg's alleged damages, he is actually serving as a mere conduit through which Plaintiff's counsel is able to introduce the data and information considered relevant or helpful to the case. Thus, in light of Mr. Egort's failure to independently assess the data provided, to challenge the fundamental assumptions that underlie Plaintiff's counsel's damages theory, and the simplistic nature of Mr. Egort's "calculations," FIU respectfully requests this Court exclude his testimony.

## **LEGAL ARGUMENT**

The admission of expert testimony is governed by Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other

8

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court performs a "gatekeeping" function in determining the admissibility of proffered expert testimony, and the Court has "considerable leeway" in its determinations. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304-1305 (11th Cir. 2014).

The United States Supreme Court developed a framework to analyze the admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under that framework, expert testimony is admissible if "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman*, 766 F.3d at 1304 (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). In *Daubert*, the Supreme Court identified four factors to assess an expert's methodology: "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community." *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94).

In addition to the factors outlined above, the Court also has the power to exclude expert testimony "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [and/or] misleading the jury." Fed. R. Evid. 403.

"Rule 403, working in conjunction with Rules 702 and 703," gives district courts "discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance." *Allison v. McGhan Med. Grp.*, 184 F.3d 1300, 1310 (11th Cir. 1999). "These stricter standards are necessary because of the potential impact on the jury of expert testimony." *Id*.

Here, Mr. Egort's expected testimony violates these principles in several ways. Mr. Egort's opinion should be excluded because it is unreliable as it does not rely on sufficient, independent facts or data. Further, Mr. Egort's failure to consider or account for Plaintiff's mitigation of damages renders his opinion incorrect as a matter of law. Finally, Mr. Egort's admittedly simple calculations used to derive Plaintiff's alleged damages are matters well within the understanding of an average juror and, as such, do not assist the trier of fact.

    **a.    Mr. Egort's Expected Testimony is Unreliable as it Does Not Rely on Sufficient Facts or Data.**

Mr. Egort's expected testimony is unreliable because his conclusions are not based upon sufficient facts or data. Where, as here, an expert's opinion is based solely upon information or data provided by a party or its counsel, the expert must perform an independent review or analysis of the data provided. *See First Premium Services, Inc. v. Best W. Int'l, Inc.*, 95-1466-CIV, 2004 WL 7203535, at *3 (S.D. Fla. Jan. 8, 2004) (collecting cases) (excluding expert opinion because expert's "unquestioning reliance on the [data provided by party] renders his opinions unreliable."); *Rossi v. Darden*, 16-21199-CIV, 2017 WL 2129429, at *9 (S.D. Fla. May 17, 2017) ("[Expert] opinions should not parrot a litigating party's testimony without independent review or analysis."). This is so because an expert's failure to independently assess the data provided by a party or its counsel creates the real possibility of partisan influence over the data and leaves the opposing party without redress as to the methodology or rationale used in obtaining same. *See Martin v. Bimbo Foods Bakeries Distribution, Inc.*, 5:14-CV-17-BR, 2016 WL 4621075, at *2 (E.D.N.C. Sept. 6,

2016) (collecting cases) ("The court does not mean to suggest that plaintiff's counsel necessarily gave the expert inaccurate numbers. But, the court does not know. Plaintiff's counsel is not a witness. Defense counsel cannot examine him. One is left to speculate about the data underlying the expert's conclusions. . . . [P]laintiff's counsel, not the expert, was the one who derived the data. Without having verified that data, the expert's testimony is unreliable and not admissible."); *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, 8:11-CV-775-T-24-TBM, 2014 WL 12623025, at *5 (M.D. Fla. May 29, 2014) (damages expert's opinion was "not a proper expert opinion, because [the expert] [was] merely parroting evidence provided to him"); *United States v. Arthur*, 10-20753-CR, 2011 WL 3844090, at *4 (S.D. Fla. Aug. 29, 2011), aff'd sub nom. *United States v. Fagan*, 518 Fed. Appx. 749 (11th Cir. 2013) (same).

Indeed, courts across the country routinely hold that an expert's failure to independently verify or assess data relied upon in an opinion renders the opinion unreliable. *See Barrueto v. Fernandez Larios*, 99-0528-CIV, 2003 WL 25782075, at *7 (S.D. Fla. Sept. 18, 2003) ("Although an expert may rely upon inadmissible materials and hearsay to form his opinion, the expert must also carry out some independent analysis of the material issues in the case."); *Legendary Art, LLC v. Godard*, CIV.A. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) ("[Expert's] reliance on projections supplied by [Plaintiff], without independent verification, renders his analysis unreliable."); *Otis v. Doctor's Associates, Inc.*, 94 C 4227, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998) (excluding expert's opinion because plaintiff "made no showing that the formula and projected values [the expert] relied on [were] accurate or ha[d] been tested for accuracy."); *Clear-View Techs., Inc. v. Rasnick*, 13-CV-02744-BLF, 2015 WL 3505003, at *3 (N.D. Cal. June 2, 2015) (citing *Zenith Elecs. Corp. v. WH–TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir.2005)) ("[D]efendants are correct that an expert may not rely merely on the self-

serving projections of his client . . . ."); *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009) (citing *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir.2004)) (affirming district court's exclusion of expert testimony where expert conducted little, if any, investigation into market conditions and failed to independently verify speculative estimates relied upon in damages model).

The reliability of Mr. Egort's opinion is further diminished considering his failure to challenge the fundamental assumptions that undergird his opinion, *i.e.* Plaintiff's ability or desire to practice medicine. Where, as here, a damages award is contingent upon speculation as to the continued course of Plaintiff's conduct after his cause of action arose, those damages are too speculative to sustain scrutiny. *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002). Thus, where an expert relies on speculative information based on counsel's instruction - - and contrary to the Plaintiff's own deposition testimony (Goldberg Depo. 207:17—208:4) - - such a methodology is not sufficiently reliable for admission at trial. *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1248-49 (M.D. Fla. 2003) (excluding plaintiff's expert witness because, *inter alia*, the expert failed to challenge a ten-year damages period provided by counsel and failed to consider the company's withdrawal from the market.)

Here, Mr. Egort testified in his deposition that he relied only upon the data provided by Plaintiff's counsel. He then plugged Plaintiff's counsel's data into a Microsoft Excel pre-installed present value formula to derive the amount of Plaintiff's alleged damages. (Egort Depo. 35:12—19; 42:4—43:23.) Under *Daubert*, Mr. Egort's failure to assess the propriety of the data provided thus renders his opinion unreliable and warrants exclusion of same. *See e.g. Sun Ins. Mktg. Network, Inc.*, 254 F. Supp. 2d at 1249 ("This case is good example of the unreliability inherent in basing an opinion on a marketing estimate."). This is especially so where even the data itself

cautions against its use in isolation without consideration of other variables that would affect average physician compensation. Pl.'s Expert Wit. Disclosure pgs. 11—12. In light of the above, Mr. Egort's opinion must be excluded as unreliable.

### b. Mr. Egort's Failure to Consider Plaintiff's Mitigation of Damages Renders His Opinion Excludable.

Plaintiff seeks damages for his lost wages and income as a result of FIU's alleged failure to accommodate his disability in violation of both the Rehab Act and the ADA. According to both Acts, Plaintiff's remedies for any such failure to accommodate are linked to those remedies provided under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12133 (remedies for disability discrimination are those provided under 29 U.S.C. § 794a); 29 U.S.C. 794a ("The remedies, procedures, and rights set for in [Title VII] . . . shall be available . . . ."). Under Title VII, a plaintiff can seek "front pay," which is an analogous remedy to the lost future income Plaintiff presently seeks as it provides prospective damages for injury to the Plaintiff's ability to work arising from intentional discrimination. *See Hudson v. Chertoff*, 473 F. Supp. 2d 1292, 1301 (S.D. Fla. 2007) (quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)) ("Front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.").

Plaintiffs seeking front pay under Title VII have a duty to mitigate their prospective damages. *See Id.* at 1297 (citing *Walters v. City of Atlanta*, 803 F.2d 1135, 1145 (11th Cir. 1986)) ("Although a plaintiff is not required to be successful in mitigating his damages, he must make a reasonable, good faith effort to mitigate."); *see also Armstrong v. Charlotte County Bd. of County Com'rs*, 273 F. Supp. 2d 1312, 1317 (M.D. Fla. 2003) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 15 F.Supp.2d 1364, 1378 (S.D.Fla.1998)) ("A plaintiff 'must mitigate her damages . . . 'A Title VII damage award should make the claimant whole, not confer a windfall.'"). Where a plaintiff

13

fails to reasonably mitigate his damages, the courts have an obligation to limit any damages to a reasonable amount in light of the failure to mitigate. *See Chertoff*, 473 F. Supp. 2d at 1302 (quoting *United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion*, 81 F.3d 798, 805 (8th Cir.1996)) ("'An award of front pay until retirement ignores the plaintiff's duty to mitigate damages and the district court's corresponding obligation to estimate the financial impact of future mitigation.'").

With respect to dismissed students, Florida law provides clarification regarding the student's obligation to mitigate damages after dismissal. In *Sharick v. Se. Univ. of Health Scis., Inc.*, 780 So. 2d 136 (Fla. 3d DCA 2000), a dismissed medical student filed suit against the medical school after receiving a failing grade in the final course required for graduation. The court found the record, which contained evidence that the plaintiff "would have been foreclosed from enrolling or graduating elsewhere," made available to plaintiff recovery for "the extent or amount of the resulting impairment to [his] earning capacity . . . ." *Id*. At 140-41. However, the court "recognize[d] the potential for mitigation of damages if [a plaintiff] fails to establish that it would be impossible for him to obtain a [medical] degree at another institution. *Id*. at 141. In that situation, like here, "the appropriate measure of damages would only be the reproduction cost of acquiring the degree elsewhere. That would include a calculation of the present value of his lost income during the time period needed to acquire the degree, coupled with the tuition and associated costs incurred at the new school." *Id*. (citing *Russell v. Salve Regina College*, 890 F.2d 484 (1st Cir.1989) and *Fussell v. Louisiana Bus. College of Monroe, Inc.*, 519 So.2d 384, 387–88 (La.Ct.App.1988)).

There are more than 140 medical schools within the United States to which Goldberg potentially could seek admission, as well as many schools outside the United States routinely

attended by physicians who then practice in the United States.³ Here, Mr. Egort failed to consider the Plaintiff's duty to mitigate his damages. (Egort Depo. 46:9—47:11.) Such and oversight renders Mr. Egort's methodology impermissible, as Plaintiff testified in his deposition that, although he believes he would not be accepted into other medical schools, he has not applied for admission to a single medical school. (Goldberg Depo. 201:19—21.) Thus, consistent with *Sharick* and other cases above, Mr. Egort's opinion should be excluded as he failed to consider or opine on Plaintiff's damages in light of his failure to mitigate. Further, Mr. Egort's opinion is fundamentally flawed and incorrect in light of his failure to account for Plaintiff's actual mitigation efforts since dismissal from FIU's medical school.

### c. Mr. Egort Does Not Opine on Matters Beyond the Understanding of an Average Juror.

Rule 702 requires that an expert's "scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, the limited nature of Mr. Egort's testimony makes it of little use to the trier of fact and exposes FIU to the potential for substantial and undue prejudice. According to Mr. Egort, the extent of his effort to derive Plaintiff's alleged damages included plugging numbers provided by Plaintiff's counsel into a preset Microsoft Excel formula. (Egort Depo. 42:4—43:23.) Admittedly, according to Mr. Egort, this was "a simple present value computation" that "anyone with access to a computer" or calculator or even a phone could perform. (*Id*. at 42:1; 43:10—16.)

Given the simplicity of the calculation, "[t]here is no requirement . . . that a party introduce expert testimony to aid a jury in its determination of present value." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1180 (11th Cir. 2002). In *Brough*, the Eleventh Circuit held it was unnecessary

---

³ https://web.archive.org/web/20130812102623/https://www.aamc.org/about/medicalschools/

15

to present expert testimony regarding the present value of the plaintiff's future salary. *Id*. at 1180, n.5. This is so because a jury properly instructed can perform the same computation as Mr. Egort without the assistance of an expert opinion. *See Id*. (collecting cases). This conclusion is further supported considering the threat of unfair prejudice to FIU, as the jury may accord greater weight to Mr. Egort's testimony in light of the "mantle of reliability that accompanies the appellation 'expert testimony.'" *See Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

## **CONCLUSION**

The Court's "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Allison*, 184 F.3d at 1311-12. Here, Mr. Egort's testimony is the type of unreliable and unhelpful testimony that, under *Daubert*, mandates exclusion. Not only is Mr. Egort's opinion based upon speculative and partisan information, which he failed to independently assess or verify, but there exists a substantial risk that a jury would accord great weight to his faulty opinions if asked to determine the amount of Plaintiff's alleged damages. This would be unfairly prejudicial to FIU. In sum, the Court properly should exclude Mr. Egort's testimony regarding Plaintiff's alleged damages.

WHEREFORE, Florida International University requests that the Court exclude Mr. Egort from testifying at trial and grant such further relief as the Court deems appropriate under the circumstances.

## **CERTIFICATE OF CONFERENCE**

Pursuant to S.D. Fla. L. R. 7.1(a)(3), I hereby certify that, on December 21, 2018, I conferred with Goldberg's counsel via e-mail in a good-faith effort to resolve the matters raised by this Motion. Goldberg agrees with the requested extension.

By: /s/ Christopher M. Yannuzzi
      Christopher M. Yannuzzi

Respectfully submitted,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Teresa Ragatz
      Eric D. Isicoff
      Florida Bar No. 372201
      Isicoff@irlaw.com
      Teresa Ragatz
      Florida Bar No. 545170
      Ragatz@irlaw.com
      Christopher M. Yannuzzi
      Florida Bar No. 92166
      Yannuzzi@irlaw.com
      Christopher A. Ajizian
      Florida Bar No. 1010170
      Ajizian@irlaw.com

**CERTIFICATE OF SERVICE**

I **HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via e-mail this 24th day of December, 2018, upon the following:

| LAW OFFICES OF SHAWN L. BIRKEN, P.A. | KIRWIN NORRIS, P.A. |
|---|---|
| Shawn L. Birken, Esq. | David Adelstein, Esq. |
| 100 SE 3rd Ave., Suite 1300 | 15 W. Church Street, Suite 301 |
| Fort Lauderdale, Florida 33394 | Orlando, Florida 32801 |
| Tel.: (954) 990-4459 | Tel.: (954) 295-6117 |
| Fax: (954) 990-4469 | Fax: (407) 740-6363 |
| E-mail: sbirken@birken-law.com | E-mail: dma@kirwinnorris.com |
| *Co-Counsel for Plaintiff* | *Co-Counsel for Plaintiff* |

By: /s/ Teresa Ragatz
      Teresa Ragatz