UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20813-CIV-MARTINEZ/OTAZO-REYES

DANIEL GOLDBERG,

    Plaintiff,

v.

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

    Defendant.
_____/

**ORDER REJECTING REPORT AND RECOMMENDATION AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THE MATTER** was referred to the Honorable Alicia M. Otazo-Reyes, United States Magistrate Judge (DE 80), for a Report and Recommendation on Defendant, Florida International University Board of Trustees ("FIU")'s Motion for Final Summary Judgment (DE 37). Magistrate Judge Otazo-Reyes filed a Report and Recommendation ("R&R") recommending that FIU's Motion for Final Summary Judgment be denied (DE 83). More specifically, Judge Otazo-Reyes concluded that a genuine dispute of material fact exists as to whether FIU rebutted Goldberg's claim of discrimination by establishing that Goldberg's requested accommodation would impose an undue hardship on the university.

FIU filed objections to the R&R, arguing that Goldberg failed to establish his *prima facie* case and therefore FIU was not required to rebut Goldberg's claim of discrimination. (DE 86). Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a *de novo* review of those portions of the R&R to which FIU objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); *United States*

1

*v. Raddatz*, 447 U.S. 667, 673-74 (1980). After conducting a careful and complete review of the objected-to portions of the R&R and the record in this case, and being otherwise fully advised, the Court **REJECTS** the R&R (DE 83) and **GRANTS** FIU's Motion for Final Summary Judgment (DE 37).

## I. FACTUAL BACKGROUND

In August 2013, Daniel Goldberg began his studies at FIU's Herbert Wertheim College of Medicine ("College") toward a four-year medical degree. (DE 38, Defendant's Statement of Undisputed Material Fact ("Def. SOF") ¶ 1). The medical program at the College was broken down into four "periods." (Def. SOF ¶ 7).

Period 1 spanned from August 5, 2013 to April 6, 2014. (*Id.*). Some courses at the College are considered fundamental science courses. In Period 1, Goldberg took three such courses: BMS 6001 (Genes, Molecules, and Cells), BMS 6100 (Structure of the Human Body) and BMS 6500 (Integrated Functions of the Human Body). (Def. SOF ¶ 8). Proficiency in fundamental courses was considered necessary for understanding future material, and a good predictor of future performance. (*Id.*).

The College publishes a Medical Student Handbook (the "Handbook"), which sets forth the rules, regulations and standards applicable to medical students. (Def. SOF ¶ 2). The Handbook is periodically updated. (*Id.*). Pursuant to the Handbook, some courses are assigned a grade of pass or fail while others are assigned a numeric grade. (Def. SOF ¶ 4). Although revisions to the Handbook contain refreshed terminology, the basic grading scheme is consistent: student performance is evaluated on a scale of 0-100, with grades below 80 considered to be the equivalent of a "D" on a traditional scale, and a grade under 75 constituting failure. (*Id.*; *see also* Def. SOF ¶ 9). In particular, the 2012-2013 Handbook provided that the lowest passing grade was 75; a grade

2

below 75 was designated by the letter "U." (Def. SOF ¶ 4).

The Handbook was updated in March 2014. (Def. SOF ¶ 5). In this Handbook, a grade of 80 or above was deemed "satisfactory," 75-79, a "low pass," and below 75, "failing." (Def. SOF ¶ 5). The Handbook was updated again in July 2015. (Def. SOF ¶ 6). This Handbook provided that a grade of 80 was the minimum to demonstrate "competency" and that grades of 75 to 79 signaled "marginal competency." (*Id*.). Students were permitted to remediate a failed course; successful remediation was evidenced on a student transcript by the mark "U75." (DE 53, Plaintiff's Counterstatement of Material Facts ("Pl. SOF") ¶ 11).

Goldberg struggled with the first two fundamental courses of Period 1, BMS 6001 and BMS 6100, earning a score of 78 in each. (Def. SOF ¶ 9). He also failed a third fundamental course, BMS 6500, but later remediated the failure. (Def. SOF ¶ 11). Based on Goldberg's poor performance in fundamental courses at the outset of his medical studies, on November 6, 2013, Executive Associate Dean for Academic Affairs, Dr. Carol Runowicz, sent Goldberg a letter advising Goldberg that his academic performance was "marginal." (Def. SOF ¶ 8). Goldberg was further placed on "Academic Watch" and advised that the Medical Student Evaluation and Promotion Committee ("MSEPC") would monitor his performance. (*Id*.) Dr. Runowicz identified Goldberg as a student the College might ultimately "ask to withdraw." (Def. SOF ¶ 10).

Period 2 commenced April 7, 2014. On May 10, 2014, Goldberg suffered an injury from which his present discrimination claim arises. On that day, Goldberg presented at Mercy Hospital following a physical altercation that left him with a scalp laceration. (Def. SOF ¶ 12). Goldberg states that he saw a woman in need of assistance and awoke in a hospital environment with no recollection of the event. (Pl. SOF ¶12). His medical records note that he was "intoxicated," "uncooperative" and "smel[led] of alcohol." (Def. SOF ¶ 12).

3

Goldberg's poor performance continued through the end of Period 2. In particular, Goldberg did not establish satisfactory competence in the following subjects: BMS 6631 (Hematop and Lymph Systems), BMS 6632 (Endocrine System), BMS 6633 (Cardio and Resp System), BMS 6634 (Gastro Syst and Med Nutri), BMS 6635 (Musculoskeletal Systems), BMS 6637 (Reproductive System), BMS 6638 (Renal System). (College Transcript, DE 38-2: 7-10). In addition, Goldberg failed BMS 6636 (Nervous Syst Behavior I), and then failed the remediation exam for that course as well. (*Id.*).

Thereafter, Goldberg was advised once again that his "academic performance in Period 2 has been marginal" and, as a result, would be maintained on "Academic Watch." (Def. SOF ¶ 15). Goldberg was further advised via e-mail that his academic performance would be formally reviewed by the MSEPC. (Def. SOF ¶ 19).

Period 2 concluded on April 12, 2015. By letter dated May 6, 2015, MSEPC noted Goldberg's "poor academic performance," including his failure of BMS 6636 and "consistently receiv[ing] borderline passing grades" in his other courses. (Def. SOF ¶ 20). MSEPC found that Goldberg's academic performance was reason for grave concern and that he was not prepared to enter the third year of medical school, as he lacked the fundamental foundation of knowledge required during clinical rotations. (*Id.*). MSEPC recommended that Goldberg repeat Period 2 and that, if he failed any other course or remediation course, he should be reviewed by the MSEPC with the possibility of dismissal. (*Id.*).

The Handbook provided that the Executive Associate Dean for Academic Affairs (Dr. Runowicz) review MSEPC's findings and recommendations, may meet with the student and may adopt, modify or reject the MSEPC recommendation. (Def. SOF ¶ 22). Following the review procedure and a meeting with Goldberg, Dr. Runowicz determined that Goldberg would be

4

required to repeat Period 2. (*Id.*).

Shortly after Goldberg was notified that he was required to repeat Period 2, Goldberg's psychologist, Dr. Desmarais, sent a letter to FIU's Disability Resource Center ("DRC") on **May 15, 2015**, which stated that Goldberg had met with a psychiatrist, had undergone preliminary testing and had been prescribed Vyvanse, a drug used to treat Attention Deficit Hyperactivity Disorder ("ADHD"). (Def. SOF ¶26). Dr. Desmarais recommended that Goldberg receive 50% extra time on examinations. (Def. SOF ¶25). The College subsequently granted Goldberg's accommodation request and provided him with 50% extra time on exams and a quiet testing room. (Def. SOF ¶28).

In sum, Goldberg did not request any accommodation for any disability until after: (a) demonstrating unsatisfactory performance in 10 courses; (b) failing another course, including its remediation exam; (c) being placed on academic watch for two academic years and repeatedly threatened with dismissal; and (d) being forced to repeat Period 2.

Goldberg's repetition of Period 2 commenced April 6, 2015. (Pl. SOF ¶24; College Transcript). Less than a month after requesting 50% extra time on exams, on June 10, 2015, Goldberg saw Dr. Kester Nedd (a neurologist unaffiliated with FIU), who opined that Goldberg suffered a "cereberal [sic] consussion [sic] on May 10, 2014" and needed double time to take tests. (Def. SOF ¶29). However, the College reviewed the corresponding memorandum from DRC and determined that it could not immediately make that accommodation. (Def. SOF ¶ 31). That decision was based on (1) the temporal proximity between Goldberg's initial request for 50% extra time and his subsequent request for 100% extra time; (2) Goldberg's lack of treatment history/baseline, as in the span of two months, Goldberg sought treatment from two different medical providers who provided two different recommendations; and (3) the College's concern

5

that providing that accommodation ultimately would be detrimental to Goldberg, as it did not believe that the National Board of Medical Examiners would provide Goldberg 100% extra time on his licensure Step Examinations. (*Id.*).

During this term, Goldberg complained of sudden onset tinnitus beginning in October 6, 2015 and sought a further accommodation through the DRC for white noise, which was approved by the College. (Def. SOF ¶¶ 34-35). Even though Goldberg was partially accommodated when repeating Period 2, he struggled once again; Goldberg's term GPA was 79.80 and he failed another class (BMS 6634), which he subsequently remediated. (Pl. SOF ¶62; College Transcript).

On November 5, 2015, Goldberg was called before MSEPC due to his failing grade in BMS 6634. (Def. SOF ¶ 37). Following that meeting, MSEPC found Goldberg's unacceptable academic performance did not permit his continuation in medical school. (*Id.*). MSEPC found that Goldberg's continued lack of insight about the importance of medical knowledge posed a threat to patients. (*Id.*). MSEPC recommended that Goldberg be given the opportunity to voluntarily withdraw from medical school and that, if he did not elect to withdraw, that he be involuntarily withdrawn. (*Id.*).

Goldberg met with Dr. Runowicz to discuss MSEPC's findings and recommendations. (Def. SOF ¶ 38). By letter to Goldberg dated November 20, 2015, Dr. Runowicz advised that she had modified the recommendation of MSEPC and stated that, given Goldberg's recent diagnosis and treatment regarding tinnitus, he would be permitted to remain in Period 2. (*Id.*). Dr. Runowicz also stated that the failure of a course or poor academic performance would result in Goldberg being reviewed by MSEPC. (*Id.*).

In April 2016, Goldberg failed BMS 6633 (Cardiovascular and Respiratory Systems) and was called before MSEPC again. (Def. SOF ¶ 39). By letter dated June 10, 2016, Goldberg was

advised by MSEPC that his continued poor academic performance was unacceptable and his lack of insight was of grave concern. (Def. SOF ¶ 40). MSEPC's recommendation, again, was that Goldberg be given the opportunity to voluntarily withdraw from the medical school or be dismissed. (*Id.*).

On or about June 23, 2016, Goldberg met with Dr. Runowicz with respect to the MSEPC report. (Def. SOF ¶ 41). At that meeting, Goldberg told Dr. Runowicz that Dr. Nedd believed that he "really needs" 100% extra testing time. (*Id.*). Dr. Runowicz then advised Goldberg that she was amending MSEPC's recommendations and that he would be referred to the College's Accommodations Committee for a review of his request for 100% extra testing time. (*Id.*).

Goldberg provided a new note from Dr. Nedd in connection with his request for reevaluation. (Def. SOF ¶ 42). The new note stated that Goldberg had suffered "a severe traumatic brain injury." (*Id.*). By e-mail dated July 5, 2016, the College advised Goldberg that he would be granted 100% additional time on written exams. (*Id.*).

In July 2016, Goldberg moved into clinical rotations in Period 3. (Def. SOF ¶ 43). Unfortunately, Goldberg also received a failing grade in his OB/GYN clerkship. (Def. SOF ¶ 44). However, during this clerkship, Goldberg was not given 100% additional time or a white noise machine for quizzes, but received 100% extra time for the final exam. (Pl. SOF ¶ 44). After failing the exam, Goldberg was ultimately able to remediate the final exam without a white noise machine. (*Id.*). Notwithstanding, Goldberg's OB/GYN instructor failed Goldberg anyway. (Pl. SOF ¶ 46).

Immediately after learning he failed the OB/GYN clinic, Goldberg sat for the so-called Shelf Exam in Family Medicine (essentially a final exam), utilizing 100% extra time on that exam. (Def. SOF ¶ 45). Goldberg failed the Shelf Exam. (*Id.*). Goldberg then retook the Shelf Exam (also with 100% extra testing time) and failed again. (*Id.*).

7

Predictably, Goldberg once again was called to appear before MSEPC. (Def. SOF ¶ 46). Given Goldberg's failures of both OB/GYN and Family Medicine and his history of poor academic performance, MSEPC recommended that Goldberg be given the opportunity to voluntarily withdraw or be involuntarily withdrawn from the College. (*Id*.). However, Goldberg believed that his failure in OB/GYN was arbitrary and capricious and that the timing of his notification that he had failed his OB/GYN clerkship adversely affected his performance on the Shelf Exam in Family Medicine. (Def. SOF ¶ 47).

To address Goldberg's concerns, MSEPC issued revised findings. (Def. SOF ¶ 48). MSEPC acknowledged Goldberg's position that his failure of the OB/GYN clerkship was arbitrary and capricious but found that, based on his historical poor academic performance and his failing grade in the Family Medicine clerkship, Goldberg's academic performance was unacceptable. (*Id*.). MSEPC found that, in light of his overall academic performance, a failure in either the OB/GYN or Family Medicine clerkship was sufficient to warrant a recommendation of dismissal. (*Id*.).

On March 29, 2017, following MSEPC's revised findings and Dr. Runowicz's corresponding recommendation, the Dean of the College, Dr. John Rock, made a final determination that, "[b]ased upon Goldberg's historical poor academic performance (specifically excluding his failure in the OB/GYN clerkship) and his poor performance in the Family Medicine clerkship, his academic performance is unacceptable." (Def. SOF ¶¶ 49-50). The Dean determined that Goldberg would be involuntarily withdrawn from the medical school in the event he did not elect to voluntarily withdraw. (*Id*.). Goldberg was further advised: "The academic decision made by [the College] was based on your academic performance and the academic judgment of the [College] faculty. The [College] has an obligation toward society, as an educational institution,

8

when certifying academic accomplishments in the field of medicine." (Def. SOF ¶ 52)

Based on the foregoing, Goldberg asserts claims against FIU under the Americans with Disability Act ("ADA") and Rehabilitation Act for failure to accommodate his brain injury. FIU has moved for summary judgment. This matter is now ripe for adjudication.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when the evidence before the court demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002) (quoting Fed.R.Civ.P. 56(c)). When considering a motion for summary judgment, "the evidence must be viewed in the light most favorable to the non-moving party." *Id*.

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Vicks v. Knight*, 380 Fed. Appx. 847, 850–51 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "[A] jury question does not exist because of the presence of a mere scintilla of evidence." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotations and citation omitted).

## III. ADA AND REHABILITATION ACT

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the Rehabilitation Act provides, "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

9

assistance." 29 U.S.C. § 794(a). Both statutes are governed by the same legal standard. *Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.*, 749 Fed. Appx. 776, 782 (11th Cir. 2018) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)).

Against this statutory backdrop, the parties are in agreement that to state a *prima facie* claim for failure to accommodate, Goldberg "must show that: (1) he is disabled; (2) he is a qualified individual; and (3) he was discriminated against by way of the defendant's failure to provide a reasonable accommodation." *McKane v. UBS Fin. Servs., Inc.*, 363 Fed. Appx. 679, 681 (11th Cir. 2010) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)). The Eleventh Circuit has repeatedly held that, "[i]n the context of postsecondary education, an 'otherwise qualified' individual must be able to meet the academic and technical standards requisite to admission or participation in the education program or activity, in spite of his handicap." *J.A.M. v. Nova Se. Univ., Inc.*, 646 Fed. Appx. 921, 926 (11th Cir. 2016) (citing *Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) and 34 C.F.R. § 104.3(l)(3)). There is "no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *J.A.M.*, 646 Fed. Appx. at 926 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979)).

**IV. ANALYSIS**

Applying the foregoing standards, the Court concludes no triable issue exists in this case. As previously set forth, the undisputed facts reveal that, even before his accommodation request, Goldberg demonstrated unsatisfactory performance in 10 courses (some, if not all, of which were fundamental), failed another course (BMS 6636, including its remediation exam), was placed on academic watch for two academic years and repeatedly threatened with dismissal, and then forced to repeat Period 2.

After receiving partial accommodations during Goldberg's compulsory repetition of Period 2, he again failed and remediated two courses (BMS 6633 and BMS 6634)—notably, performing worse than the prior academic year in which he received no accommodation at all, and he could not demonstrate competence in two others (BMS 6636, BMS 6635).

Finally, in Period 3, after receiving partial accommodation for an OB/GYN clinic and full accommodation for a Family Medicine clinic, he failed both classes.

On this record, the Court has no trouble concluding that Goldberg was not a qualified person with a disability because his performance was unacceptable notwithstanding any accommodation by the College. Goldberg was simply unable to satisfy essential academic requirements—before, during, or after—his accommodation request. In reaching this conclusion, this Court declines to engage in hair-splitting urged by Goldberg over whether the Handbook's terminology for a grade between 75 and 80, or a failure that is later remediated, is considered a "low pass" or "marginal competence," or something entirely different.

The fact remains that Goldberg's performance was unsatisfactory to the College, regardless of the descriptors employed by the Handbook. Indeed, Dr. Runowicz stated that Goldberg's below-80 (but still technically "passing") scores in fundamental classes during his first year raised the possibility that he may be asked to withdraw. From there, his scores plummeted in his second year. Based on his borderline scores MSEPC found that Goldberg's academic performance was reason for grave concern and posed a danger to patients. MSEPC indicated that Goldberg's failure of any other course could serve as a predicate for dismissal. There is no question that Goldberg was unqualified based on his pre-accommodation performance. And that conclusion is crystallized by the College's requirement that Goldberg repeat Period 2.

Case law provides that the College was not obligated to accommodate Goldberg before he

11

requested accommodations. *Zainulabeddin*, 749 Fed. Appx. at 783 (11th Cir. 2018) (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("[A] plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against him by failing to provide a reasonable accommodation unless he demanded such an accommodation.")). Thus, without more, Goldberg's unacceptable performance prior to his May 15, 2015 accommodation request to DRC ends this case.

But, unfortunately for Goldberg, there is more. Even after receiving partial accommodation during his repetition of Period 2, he actually received worse scores in some courses, and continued to fail. Then, after receiving full accommodations in Period 3, he failed again. Consistent with earlier warnings of Dr. Runowicz and MSEPC, Goldberg's poor performance made him eligible for involuntary dismissal. That the College permitted Goldberg to continue his studies at sufferance, so-to-speak, and provided him repeated opportunities to rescue his foundering medical career, is irrelevant to this Court's analysis, and certainly not competent evidence that Goldberg was qualified. [1] Put simply, no reasonable juror could find in favor of Goldberg.

Although not binding here, the recent case *Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.* is

---

[1] In this connection, Goldberg contends that a genuine issue of material fact exists merely because "FIU passed Goldberg through his first year, his second year; and allowed Goldberg to render medical services to patients" and that "[b]y continuing to pass Goldberg and continuing to advance Goldberg further into medical school, both with and without accommodations, FIU clearly deemed Goldberg qualified." (DE 87: 8).

The Court disagrees. Goldberg's inference would require a jury to consider isolated facts out of context and adopt a misleading impression of the evidence; that is not a reasonable suggestion. The College permitted Goldberg to continue his studies conditioned upon his ability to improve his performance (which he ultimately could not do), and then required Goldberg to repeat his second year. The Medical Student Evaluation and Promotion Committee expressly found that Goldberg posed a threat to patients. Then, with full accommodations, Goldberg failed a course in his third year and was expelled from the College. Considered in context, the facts Goldberg points to are insufficient to establish that he was "able to meet the academic and technical standards requisite to . . . participation in the education program or activity, in spite of his handicap." *J.A.M.*, 646 Fed. Appx. at 926.

particularly instructive. 749 Fed. Appx. 776. There, the Eleventh Circuit reviewed a district court's grant of summary judgment to a university facing a failure-to-accommodate claim by a medical student (Zainulabeddin). The medical student struggled to meet the academic requirements of her school's program and was required to repeat her first academic year. *Zainulabeddin.*, 749 Fed. Appx. at 778-79. Based on an ADHD diagnosis, the student ultimately requested and received various accommodations, including "increased time and a distraction-free environment." *Id*. However, she still failed two courses, and was thereafter dismissed by the medical school. *Id*. at 780. The Eleventh Circuit affirmed, stating that "[the student] ultimately failed two courses even after receiving disability accommodations" and accordingly concluded that "the [school's] subsequent dismissal decision cannot reasonably be attributed to discrimination." *Id*. at 784.

Significantly, Zainulabeddin successfully remediated her failed first- and second-year courses. In this case, by contrast, Goldberg failed to remediate BMS 6636 (Nervous System Behavior I) during the 2014-2015 academic year, and further failed to remediate his Family Medicine Shelf Exam during the 2016-2017 academic year, in addition to demonstrating unsatisfactory performance in a dozen other classes. With greater reason, summary judgment is warranted here.

Although the appellate court in *Zainulabeddin* did not expressly reach the issue of whether the student was an "otherwise qualified" individual because "this issue was bound up with the inquiry into whether [the university's] proffered reason was pretextual," *id*. at 781, and n. 4, its conclusion regarding an intertwined issue on strikingly similar facts in a summary judgment posture is highly persuasive to this Court.

## V. CONCLUSION

The Court has conducted the required *de novo* determination pursuant to 28 U.S.C. § 636(b)(1)(C). For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that United States Magistrate Judge Otazo-Reyes' Report and Recommendation (DE 83) is **REJECTED**. Defendant's Motion for Final Summary Judgment (DE 37) is **GRANTED**. The Clerk shall mark this case **CLOSED** and **DENY** pending motions as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9th day of April, 2020.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE